Seaboard Finance Company, et al. 1 v. Commissioner. Seaboard Finance Co. v. CommissionerDocket Nos. 1756-62 - 1764-62, 1766-62 - 1772-62.United States Tax CourtT.C. Memo 1964-253; 1964 Tax Ct. Memo LEXIS 84; 23 T.C.M. (CCH) 1512; T.C.M. (RIA) 64253; September 28, 1964*84 Austin H. Peck, Jr., 615 S. Flower. St., Los Angeles, Calif., and James J. White, for the petitioners. Wesley A. Dierberger, for the respondent. DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in the income taxes of petitioners: DocketYearPetitionerNo.EndedDeficiencySeaboard Finance Company1756-629-30-57$143,932.679-30-58285,877.45Seaboard Finance Company, Transferee1757-629-30-576,038.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,491.96Seaboard Finance Company of Lynwood1758-629-30-561,689.57Seaboard Finance Company of Monterey1759-629-30-58634.79Seaboard Finance Company of Northern California1760-629-30-571,890.999-30-583,728.66Seaboard Finance Company of Colorado Springs1761-629-30-575,972.049-30-581,507.66Seaboard Finance Company of Denver, Two1762-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,181.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,908.679-30-584,751.98Seaboard Finance Company of Denver, Three1763-629-30-564,014.009-30-574,338.209-30-581,739.46Seaboard Finance Company of Denver, Four1764-629-30-563,427.679-30-573,427.669-30-581,165.08Seaboard Finance Company of Denver, Five1766-629-30-569,892.299-30-577,620.669-30-585,490.77Seaboard Finance Company of Pueblo, Two1767-629-30-566,510.469-30-579,799.679-30-582,563.37Seaboard Finance Company of Connecticut, Inc.1768-6212- 1-549-30-553,138.109-30-56383.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,827.739-30-589,811.91Seaboard Finance Company (Idaho)1769-6211-30-5812,145.64Seaboard Finance Company of Terre Haute, Inc.1770-6212-31-55887.37Seaboard Finance Company Inc. (Mass.), Transferor1771-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,491.96Seaboard Finance Company of Flint1772-629-30-583,728.48*85 Overpayments were claimed by some of the petitioners but were abandoned at the trial of these cases. By Amendment to Answer in Seaboard Finance Company, Docket No. 1756-62, the respondent claimed increased deficiencies as follows: Year EndedAmount9-30-57$1,120.109-30-588,081.62Several issues raised in the pleadings have either been settled by stipulation or by concession and can be given effect in the Rule 50 computations. The principal issue presented for decision is whether petitioners are entitled to amortize amounts paid on the purchases of loan receivables or whether the amounts so paid represent a part of the cost of acquiring going businesses and as such are not subject to amortization. A secondary issue is whether certain amounts paid in connection with the issuance of a nontaxable stock dividend are deductible as ordinary and necessary business expenses or are capital expenditures. Findings of Fact Numerous facts have been stipulated and are hereby found accordingly. I. General Facts Relating to Seaboard Finance Company and its Subsidiaries Seaboard Finance Company (hereinafter sometimes referred to either as Seaboard or as Seaboard*86 Finance Company (Parent)) is the petitioner in Docket Nos. 1756-62 and 1757-62 and is the parent corporation. The other petitioners are wholly-owned subsidiaries of Seaboard. Seaboard was incorporated under the laws of the State of Delaware. Its main office is located in Los Angeles, California. It filed its Federal income tax returns for the taxable years ended September 30, 1957, and September 30, 1958, with the district director of internal revenue, Los Angeles, California. Its Federal income tax returns were made on the accrual basis of accounting. Seaboard was engaged principally in the business of making small loans. It also purchased and serviced retail installment sales contracts acquired from dealers. These contracts do not have the yield that the small loan business has but they produce some new loan customers. Seaboard operated its various offices either as branches of the parent company or as wholly-owned subsidiary corporations. During 1957 and 1958 Seaboard was in a period of rapid expansion. In the year ended September 30, 1956, Seaboard Finance Company had 339 offices in 34 States. In the taxable year ended September 30, 1957, Seaboard had 412 offices in 36*87 States. In the taxable year ended September 30, 1958, Seaboard had 514 offices in 39 States. Geographical expansion is further illustrated by the increase in the number of cities in which Seaboard had offices. In the taxable year ended September 30, 1956, it had offices in 267 cites and in the taxable year ended September 30, 1959, it had offices in 426 cities. The number of accounts, both personal loans and sales contracts, increased from 773,033 in the taxable year ended September 30, 1956, to 950,408 in the taxable year ended September 30, 1959. Seaboard also had three wholly-owned insurance subsidiaries, two of which are casualty and the other a life insurance company. The casualty companies, Balboa Insurance Company and Arrowhead Insurance Company, are engaged primarily in the business of writing automobile damage and fire insurance. The life company, Provident Alliance Insurance Company, Ltd., is engaged in reinsuring short term credit life policies. Credit life insurance insures the life of a debtor to the extent of the debt and is written by the same employees of Seaboard who make loans to Seaboard customers. This insurance is then reinsured with Provident Alliance Insurance*88 Company. Seaboard also operates the Ever-Ready Check Program which is a plan in which customers with approved credit can receive quick loans. It operates much like a line of credit established by a business with a commercial bank. Seaboard and its subsidiary corporations acquired 73 new offices in the taxable year ended September 30, 1957, and 102 new offices in the next taxable year. Part of these new offices were purchased during the taxable years and part were established by opening branches. Of the new offices purchased, part were operated as branches and part were operated as subsidiary corporations. The expansion carried on by Seaboard gave a broader geographic coverage to the operations of the company and, as such, lent stability to its operations. The large number of offices operating as branches or subsidiary corporations of Seaboard provided a convenience for its customers and, as such, gave it competitive strength. In determining whether Seaboard or its subsidiaries were to acquire a new office, the location of that office was a factor considered. If Seaboard should happen to acquire an office across the street from one it was operating, it would combine the two*89 offices and either move one or close one. The small loan business is subject to strict controls by the various States since the rate of interest charged by a small loan company is higher than the general usury laws of a State. The various States require a small loan company to obtain a separate license in order to operate an office. Some States issue licenses based upon a test of convenience and necessity which is a determination that the issuance of a license would be to the convenience and advantage of the public. Seaboard or its subsidiaries would not buy an office if it could not acquire its small loan license by transfer to Seaboard. The maximum rate of interest which can be charged by a small loan company varies in the different States. In California the rate per month now is 2 1/2 percent on the first $200, 2 percent on the next $400, and 5/6 of 1 percent on the remainder up to $5,000. In the taxable years ended September 30, 1957, and 1958, the rate was 2 1/2 percent on the first $100, 2 percent on the next $400 of balance and 5/6 of 1 percent on any portion of the balance exceeding $500. This interest amounts to 30 percent on the first $100. When a customer comes in*90 to one of the branches of Seaboard or its subsidiaries to borrow money, his credit responsibility is checked. Seaboard makes a credit check on the borrower and generally gets a report from the various credit bureaus. Seaboard arranges a budget for all of the person's expenditures. References are required and are checked by Seaboard. In some instances security is required for the loan. In the State of California a wage assignment is acceptable as security. Seaboard and its subsidiaries advertise extensively to attract customers. Direct mail advertising is sent to customers of Seaboard and direct mail solicitation is carried on of former customers of Seaboard and its subsidiaries. The employees of Seaboard and its subsidiaries obtain from a prospective borrower the reason why he chose Seaboard from which to borrow his money. Each office maintains statistics as to the average size of a loan and the average period for which the loan was made. This record is sent to the main office in Los Angeles, California, at the end of each month. Statistics maintained by Seaboard and its subsidiaries show that in the taxable year ended September 30, 1957, the average size of a loan made by Seaboard*91 and its subsidiaries was $431. In the taxable year ended September 30, 1958, the average size of the loan made by Seaboard and its subsidiaries was $433. In the taxable year ended September 30, 1957, the average period for which a loan was made was 16.8 months and in the taxable year ended September 30, 1958, the average period was 19.3 months. It costs Seaboard and its subsidiaries approximately $1.25 a month in direct operating costs to carry a loan account. Generally overhead costs are 50 percent of the interest income. The cost of obtaining the money, if from borrowed funds, is 25 percent of the gross interest collected. New business comes from various sources. However, some of the new loan business of Seaboard and its subsidiaries comes from its present customers. In the taxable year ended September 30, 1957, Seaboard and its subsidiaries made 553,400 loans, of which 219,349 were from new customers and were new accounts. 334,051 of these loans were from present customers and were refinancing of existing accounts. When an existing account is refinanced, new funds were advanced on 99.01 percent of such loans. In the taxable year ended September 30, 1958, Seaboard and its subsidiaries*92 made 684,221 new loans, of which 269,920 were to new customers and 414,301 were to present customers by refinancing of existing balances. When an account of a present customer was refinanced, additional funds were advanced in 99 percent of the cases. Of the remaining new business, approximately 25 percent comes from former borrowers who have previously paid off their loans. A customer of Seaboard and its subsidiaries will refinance his loan two to three times before finally paying it off. When a loan is paid down, Seaboard and its subsidiaries contact their customers and offer them additional money. They also contact their customers with the offer of an "all-in-one" package loan which, in effect, suggests to the customer to put all of his obligations in one total and borrow the money from Seaboard to pay off the numerous obligations. During the taxable years in issue Seaboard and its subsidiaries acquired receivables from 55 offices. However, by far the greater part of Seaboard's growth during such years resulted from its own operations and development efforts, including not only the expansion of loan portfolios in its existing offices but also the opening of 120 new offices. *93 The advertising and promotional efforts required from the newly opened offices were the same in kind and extent as those which were carried on in Seaboard's existing offices and in the locations in which Seaboard purchased loan contracts. Two of the acquisitions by Seaboard were made by purchase of stock; the assets of one company were acquired in exchange for Seaboard stock; and Seaboard acquired all others by purchasing assets for cash. In starting a small loan office there are certain start-up costs. These costs are incurred prior to the time that the small loan office starts earning money. The overhead of the office begins immediately, rent is payable immediately, salaries are payable, and supplies of all kinds are necessary. The new office will lose money for a period of time after it begins business. After a new small loan office is started, it takes approximately 18 months of operation before the new office begins to break even. It usually takes an additional year or longer to start making money. The costs incurred by a new small loan office prior to the time when it begins to break even in its operations are referred to by the petitioners as start-up costs. When a small*94 loan company that has been in operation for some time is purchased, the buyer avoids the necessity of operating for a period of 18 months or longer at a loss and avoids incurring the start-up costs necessary to put a new small loan office on a paying basis. There is competition among various large small loan companies in acquiring smaller loan companies. In each purchase Seaboard paid an amount which exceeded the book value of the assets purchased. The principal assets acquired in each purchase were the small loan contracts owned by the seller. Furniture and fixtures were in most, if not all, cases purchased for an amount equal to the seller's book cost. In each purchase Seaboard determined the value to it of the loan contracts which it was purchasing. The value of the loan contracts and the other assets purchased was used in bargaining with the seller for the acquisition of the loan business. In most cases there was competitive bidding made for the purchase. The valuation was made by two different methods: (1) In the American National Finance Company, Capital Finance Corporation, and City Finance Company purchases, the sellers maintained detailed statistical records at their*95 respective headquarters, some of which were duplicates of records in their branch offices. From these statistical records Seaboard was able to obtain the same information which it could obtain from "spreading" the contract. Examination of the statistical and duplicate records enabled Seaboard to value the loan contracts to be purchased. (2) In all other purchases Seaboard "spread" the loan contracts. "Spreading" loan contracts consists of an examination of each loan contract to be purchased and the file of information concerning the particular contract and the borrower. The spreading was performed by experienced representatives of Seaboard. The mechanics of spreading consist of listing in columns the number of each loan contract, the name of the borrower, the principal balance due, and a rating or classification of the individual contract. The usual classification symbols, are A+, A, B, C, D, and E. In classifying the individual contract the person making the spread examined the contract itself and the file relating thereto, any credit check which had been made on the borrower, and any other pertinent information concerning the particular borrower which the seller may have had*96 in its possession. The person making the spread also ascertains the age of the borrower, his employment, the amount of time he has held his job, whether his wife is employed, the size of his family, and the payment record of the borrower. When the person spreading the contracts has completed his classification of the loan contracts he totals the principal balances of the loan contracts in each classification. He then adds to the total principal balances of the A+ accounts a percentage of the total balance which, in the purchases here involved, range generally between 15 and 30 percent. From the amount added to the balances of the A+ accounts, there had previously been deducted the accounts which were valued below 100 percent. Retail sales contracts purchased were also valued and became a part of the negotiating price. The determination of the percentage or premium to be added to the principal balances owing on the A+ accounts depends on several factors. First, if the overall quality of the loan contracts being spread compared not with each other but with loan contracts in other loan offices, is good, the percentage of premium will be relatively higher. Second, the percentage or*97 premium is influenced by the effective yield obtainable on the loan contracts under the laws of the State in which the loan contracts are located. Because of variations between the States in the maximum permissible interest rate, a loan contract with a given borrower in a given amount will yield a higher return in one State in comparison with another. Third, supply and demand affect the percentage or premium. If there is competition for the purchase of loan contracts, the person making the spread may increase the premium on that account in order to give better assurance of being able to complete the purchase. The discount on other accounts is also figured by Seabord's employee on different criteria. And in some cases a finder's fee is paid by the purchasing loan company. No percentage or premium is added to the principal balances of loan contracts classified as A. The aggregate principal balances of loan contracts in the other classifications are discounted by varying percentages. In determining the aggregate value of the loan contracts to be purchased the person making the spread adds to the aggregate principal balances owing on all of the loan contracts the premium on the A+ *98 contracts, and subtracts the discount, if any, on the other contracts. The resulting figure is the amount which is offered for the loan contracts. The method of spreading, as described above, was used by Seaboard in determining the value of all of the loan contracts the purchase of which is involved in these consolidated proceedings with the three exceptions previously noted. Determining the value of the loan contracts does not necessarily determine the amount paid for the acquisition of the business of the seller but is one factor used in determining the amount to be offered to the seller. In the purchases here involved the loan contracts which were classified as A+ and A far exceed in number and aggregate principal balances those which were rated in lower classifications. In each of the purchases Seaboard paid a net premium the aggregate amount of which is the amount disallowed by respondent and in dispute herein. Normally the spreading of contracts is performed either at night or over weekends at the seller's office but at times when the office is not open for business. This is done at the seller's request so that his employees will not obtain knowledge of a possible sale*99 of the business. Normally there is no contact between the person making the spread and the seller's employees. In none of the purchases here involved did Seaboard make any investigation, prior to purchase, of any of the sellers' personnel at or below the level of branch manager. Prior to the purchases from American National Finance Company and National Finance Corporation, Seaboard made investigations concerning the head office staff of each seller to determine what liability, if any, Seaboard might have following the acquisition with respect to continued employment of such personnel. Of the 53 branch managers which Seaboard accepted as employees in the purchases here involved, 26 left Seaboard within 1 year. Only 14 were still employees of Seaboard in March 1964. In each case Seaboard changed the name of the acquired office to a name incorporating the word "Seaboard." In no case did Seaboard use the name of the acquired company after purchase. In none of the purchases here involved did Seaboard add anything to the purchase price on account of office location. In some instances Seaboard had determined, prior to the purchase, that the seller's office location was undesirable*100 and would be moved. Notwithstanding this decision, Seaboard paid substantial premiums on the loan contracts purchased in such office locations. Seaboard did not allocate any part of the purchase price for the acquisition of a small loan license. In each case Seaboard had to apply for and receive a license in its own name before it was permitted to operate a branch at the seller's location. Many of the acquisitions were contingent upon the issuance of a license to Seaboard at the seller's location. In the transactions here involved some of the loan contracts purchased by Seaboard were secured by collateral, such as a chattel mortgage on an automobile, furniture, or the like, but most of them were unsecured. Seaboard's experience over many years of operation has been that secured loan contracts run off on the average in approximately 3 years whereas unsecured loans, where possibilities of refinancing and renewal are greater, remain on its books for an average of 5 years. Where the contracts provided for a covenant not to compete for a period of 3 years, the amount paid for the covenant was generally amortized over a 3 year period. Where there was no covenant not to compete, the premium*101 was amortized over a 5 year period. During the taxable years in issue it was Seaboard's experience that the average annual run off of outstanding secured loan contracts on its books was 35 percent and of outstanding unsecured contracts it was 27 percent. Seaboard maintained such statistics in 1956 and prior thereto and utilized them as one of the bases for estimating the useful life of the purchased loan contracts. The "account life" or run off demonstrated by Exhibit 75 (dealing with the Wharton office of American National Finance Company) and Exhibit 76 (dealing with the accounts purchased from American National Finance Company) is representative of other loan accounts here involved and of Seaboard's experience generally. Seaboard's estimate in 1956 and 1957 of the useful life of the accounts here involved was based upon the foregoing statistics derived from its own experience, and on statistics of various other consumer finance companies published in public prospectuses. II. Facts Relating to Purchases of Branch Offices by Seaboard and its Subsidiaries 1. Seaboard Finance Company, Docket No. 1756-62. On October 16, 1956, Seaboard entered into an agreement for the purchase*102 of the assets of American National Finance Company, a Delaware company incorporated on September 11, 1930. The assets were shares of common stock of subsidiary corporations owned by it as set forth hereafter. The agreement provided that all of the assets and properties of American National Finance Company, except its goodwill and going concern value, would be purchased by Seaboard. No purchase price was set forth in the agreement. As a part of the agreement in Schedule B attached thereto, the shareholders agreed to dissolve American National Finance Company. Thereafter, Seaboard caused the liquidation and dissolution of each of the subsidiary corporations whose shares it acquired from American National Finance Company. Seaboard paid American National Finance Company an amount which exceeded the face amount of the loan accounts and the book value of the tangible assets acquired from the liquidation of each subsidiary which amount was placed in an account on its books described as "Premiums Paid on Purchased Accounts." In its Federal income tax returns for the years ended September 30, 1957, and 1958, Seaboard carried these sums on its balance sheet as "Premiums paid on purchases of*103 assets of other finance companies." The following is a list of the corporations acquired and the dates on which they were incorporated: Name of CorporationDate IncorporatedIndustrial Loan Society, Inc.,N.J.February 1923National Small Loan Society,Inc.April 1923American Loan Society, Inc.January 1921Equitable Industrial Loan So-ciety, Inc.July 1919Mutual Loan CompanyJanuary 1942Industrial Loan Society, Inc.,Md.July 1939National Equitable Loan So-ciety, Inc.May 1923Industrial Loan Society, Inc.,DelawareApril 1923The above corporations which were acquired by Seaboard had 21 branch offices and a total of 25,050 loan accounts outstanding in December 1956. The premium paid American National Finance Company totaled $1,864,895.63 which was allocated to the subsidiary corporations upon their liquidation on the books of Seaboard as follows: AmortizationOfficePremium9-30-579-30-58Industrial Loan Soc. Inc.$648,983.68$99,794.70$133,059.60National Small Loan Soc., Inc.128,304.8219,216.8025,622.40American Loan Soc., Inc. (Seaboard Finance Corp.of Mass.)136,510.3611,612.1527,869.16Mutual Loan Co.218,938.7533,687.0944,916.12Equitable Loan Society (SFC, Connecticut)217,819.8125,374.2343,498.68Industrial Loan Soc.44,571.006,683.498,911.32National Equitable Loan Society92,312.3313,826.0718,434.76Industrial Loan Soc. Inc.375,962.9656,574.7575,811.56American National Finance Co.1,491.92232.02309.36*104 The above amortization was claimed in the returns of Seaboard as a deduction and was disallowed by the respondent for each of the years ended September 30, 1957, and September 30, 1958, as indicated in the schedule, with the exception of American Loan Society, Inc. (Seaboard Finance Company, Inc. (Massachusetts)) and Equitable Loan Society (Seaboard Finance Company of Connecticut). Of the above subsidiary corporations, Seaboard allocated and transferred to Seaboard Finance Company, Inc. (Massachusetts) $136,510.36 of the premium in connection with a transfer of assets to such subsidiary as set forth in the above table and Seaboard Finance Company, Inc. (Massachusetts) amortized such premium as set forth in the above table. Seaboard allocated or transferred to Seaboard Finance Company of Connecticut $217,819.81 of the premium in connection with a transfer of assets to such subsidiary as set forth in the table above and Seaboard Finance Company of Connecticut amortized such premium on its books. Respondent disallowed such amortization deductions. On August 16, 1957, Seaboard entered into an agreement with Capital Finance Corporation, an Ohio corporation with offices in New York, *105 in which it acquired: All those certain small loan borrowers' and sales finance obligors' notes, promises to pay and other obligations, secured and unsecured, hereinafter called "accounts", an inventory of which has been made by the parties hereto and is incorporated herein by reference, and which are inventoried by account number, name, and balance on said accounts totalling $2,763,471.95 on July 31, 1957. In addition, Seaboard acquired the furniture and fixtures and the offices located at the following addresses: 191 Mericho Turnpike, Mineola, Long Island, N. Y. 7 W. Marie St. cor. Broadway 2nd Fl. Rm. 3, Hicksville, Long Island, N. Y. 231-26 Merrick Blvd. cor. 231st, Laurelton, New York 160-08 Jamaica Ave. Rm. 204, Jamaica, New York 31-90 Steinway St. Rm. 6, 2nd Fl., Astoria, Long Island, New York 219-32 Jamaica Ave., Queens Village, New York On the same day, August 16, 1957, Seaboard entered into an agreement with City Finance Company, a Delaware corporation with offices in New Jersey. Under this agreement, Seaboard acquired: All those certain small loan borrowers' and sales finance obligors' notes, promises to pay and other obligations, secured and unsecured, *106 hereinafter called "accounts", an inventory of which has been made by the parties hereto and is incorporated herein by reference, and which are inventoried by account number, name, and balance on said accounts totalling $1,129,897.78 on July 31, 1957 * * * In addition, Seaboard acquired the furniture and fixtures and the offices at the following addresses: 4912 Bergenline Ave., Rm. 10, West New York, New Jersey218-220 N. Wood Ave., 2nd Fl. Rm. 200, Linden, New Jersey14 S. Park St. 2nd Fl. Rm. 10, Montclair, New Jersey22 Broadway Gr. Fl., Passaic, New JerseyUnder the agreements with Capital Finance Corporation and City Finance Company, a premium was paid in the amount of $917,612.30. This premium was amortized by Seaboard over 5 years. For the taxable years ended September 30, 1957, and September 30, 1958, petitioner amortized and deducted $30,587.08 and $183,522.48, respectively. These amounts were deducted in the Federal income tax returns filed for these years and were disallowed by respondent. On May 23, 1957, Seaboard and its subsidiary Seaboard Finance Company (Idaho) entered into an agreement with National Finance Corporation. National Finance Corporation was*107 operating four offices in the State of Idaho at Lewiston, Moscow, Coeur d'Alene and Sandpoint. It was also operating two offices in the State of Washington at Clarkston and Spokane. The purchase agreement provided that Seaboard purchase all of the assets and property of National Finance Corporation of every kind and nature except its corporate name, its goodwill, its going concern value and its reacquired stock carried in its treasury. The agreement also provided that: This agreement and sale is subject to Seaboard receiving satisfactory assurance of the effective assignment to Seaboard of all of National's office leases in their present form and is further subject to Seaboard receiving satisfactory assurance from the proper departments of the States of Idaho and Washington that National's small loan licenses for each of its six offices will either be transferred to Seaboard, or that Seaboard shall receive from said respective departments small loan licenses for the operation of said offices in its own name or names, and if such assurance cannot be obtained by the date of delivery of assets hereinafter provided for, then this agreement shall terminate without liability of any party*108 hereto to the other, and shall be of no further force and effect. National Finance Corporation agreed that it would liquidate and dissolve upon the consummation of this transaction as soon as possible. In its return for the taxable year 1957, National Finance Corporation attached a schedule showing a computation of its gain on the sale of the assets referred to above. That computation is as follows: Sale price per bill of sale dated June 5, 1957$1,357,055.00Assumption of Liabilities: Bank notes payable$ 190,000.00Social Security & W. Tax3,113.09Provisions for 1946 Taxes33,541.28Accrued expenses5,238.32231,892.69Total Sale Price$1,588,947.69Assets Acquired: Cash on Hand$ 11,300.00Cash on Deposit76,228.69Prepaid Ins. (cancellation value)2,942.42Small Loans1,028,178.49Wholesale Loans3,662.82Retail Contracts393,100.39$1,515,412.81Less Reserves: Reserve for bad accts$42,748.26Dealers reserve21,095.95Unearned discount37,943.24101,787.45$1,413,625.36Fixed Assets:$52,015.06Less res. for depr26,417.8325,597.231,439,222.59Net Profit - To Sch. M 4$ 149,725.10*109 In connection with the purchase of the assets from National Finance Corporation, Seaboard paid a finder's fee in the amount of $10,000. The profit which National Finance Corporation showed of $149,725.10 plus the $10,000 finder's fee, with a minor adjustment, totals the premium amortized by Seaboard of $158,977.66. The total net payment for the assets purchased amounted to $1,207,329.90. Seaboard allocated to four offices located in Idaho acquired from National Finance Corporation the sum of $1,051,324.39 of the net assets and $116,784.99 of the premium. These four offices were operated by Seaboard Finance Company of Idaho. Seaboard retained and incorporated as a part of its own operation two offices located in the State of Washington and allocated the sum of $156,005.51 of the price paid to the assets in the two Washington offices and allocated the sum of $42,192.67 of the premium paid to the assets located in the same two offices. Of the premium paid by Seaboard and allocated to the assets in the two offices located in the State of Washington, Seaboard amortized and deducted the amount of $2,812.85 in the taxable year ended September 30, 1957, and $8,433.52 in the taxable year*110 ended September 30, 1958. The respondent disallowed the deductions. On June 28, 1957, Seaboard entered into an agreement with Monmouth Loan Corporation, a New Jersey company incorporated on April 13, 1955, located in Keansburg, New Jersey, in which Seaboard acquired all of the stock of Monmouth Loan Corporation which had 10 shares of stock outstanding out of 100 shares authorized. Monmouth Loan Corporation agreed that: Seller shall have delivered to Seaboard a certificate executed by Seller and the officers and directors of Monmouth Loan, wherein Seller and each such officer and director warrants that he will not either directly or indirectly or through any agent, person or corporation, carry on or encourage or aid or induce any other person, partnership or corporation to carry on a business similar to the business presently conducted by Monmouth Loan within a radius of 25 miles from the existing Monmouth Loan office for a period of 5 full years next succeeding the Closing, provided, that the foregoing shall not be construed to prevent the Seller or any such officer or director from owning stock in or becoming an officer or director of any banking institution authorized to accept*111 deposits. Such certificate was executed by the officers of the seller and is attached to the agreement. In the purchase of these 10 shares of stock, Seaboard paid a premium in the amount of $13,464.56. In the taxable year ended September 30, 1957, Seaboard amortized and deducted $628.83. In the taxable year ended September 30, 1958, Seaboard amortized and deducted $2,737.32. The respondent disallowed the deductions. On August 22, 1957, Seaboard entered into an agreement with K. J. Phelan, doing business as Reliable Credit Company, an Illinois corporation located in Chicago, Illinois, in which Seaboard purchased from Reliable Credit Company: promissory notes, choses in action and documents relating and pertinent thereto, such as, but without limitations, chattel mortgages, liens, assignments, and the like (all of which papers are severally and collectively referred to as "intangible property"), all of which property is listed by account number, name of obligor and unpaid balance on the schedule attached hereto, marked for identification as "Schedule A" and incorporated herein by reference * * * Seaboard also purchased from Reliable Credit Company the furniture, fixtures and*112 equipment and telephone numbers and acquired the lease of Reliable Credit Company on the property at 5633 West Madison Street, Chicago, Illinois, and the loan license No. 99 issued by the Banking Department of the State of Illinois to carry on the small loan business at that address. For the same consideration, Seaboard acquired from Reliable Credit Company: all paid in full account records of First Party relating to business transacted by First Party at 5633 West Madison Street, Chicago, Illinois, and First Party hereby covenants and agrees that for a period of three (3) years from the date of this Agreement neither he nor his agents will make loans directly or indirectly to the persons listed in the accounts on Schedule A of this Agreement. Seaboard and Reliable Credit Company further agreed that: * * * In the event that said Department of Insurance of the State of Illinois shall disapprove of the sale of the assets which are the subject matter of this Agreement, or in the event said Department shall refuse to consent to Seaboard Finance Company continuing the small loan business in the offices presently occupied by First Party, this Agreement shall be null and void, and*113 any consideration which has been paid to the First Party by Second Party, as provided herein, shall be returned forthwith to Second Party without deduction for any cause whatsoever. Seaboard paid a premium to Reliable Credit Company in the amount of $44,633.87 which was amortized over a 5 year period. In the taxable year ended September 30, 1957, Seaboard amortized and deducted $744.80. For the taxable year ended September 30, 1958, Seaboard amortized and deducted $8,926.80. The respondent disallowed the deductions. On June 17, 1957, Seaboard entered into an agreement with Phoenix Finance Company, Inc., an Illinois corporation, in which Seaboard purchased from Phoenix Finance Company, Inc.: promissory notes, choses in action and documents relating and pertinent thereto, such as, but without limitations, chattel mortgages, liens, assignments, and the like (all of which papers are severally and collectively referred to as "intangible property"), all of which property is listed by account number, name of obligor and unpaid balance on the schedule attached hereto, marked for identification as "Schedule A", and incorporated herein by reference * * * Seaboard also purchased from*114 Phoenix Finance Company, Inc., the furniture, fixtures and equipment, and telephone numbers and acquired the lease of the premises of Phoenix Finance Company, Inc., at 417 East 47th Street, Chicago, Illinois, and at 2400 West Madison Street, Chicago, Illinois, and the small loan license numbers 476 and 601 issued by the Banking Department of the State of Illinois to carry on the small loan businesses at the above addresses. For the same consideration, Seaboard acquired from Phoenix Finance Company, Inc.: all paid in full account records of First Party relating to business transacted by First Party at 2400 West Madison Street, Chicago, Illinois, and 417 East 47th Street, Chicago, Illinois, and First Party hereby covenants and agrees that for a period of three (3) years from the date of this Agreement neither he nor his agents will make loans directly or indirectly to the persons listed in the accounts on Schedule A of this Agreement. Seaboard and Phoenix Finance Company, Inc., agreed that: * * * In the event that said Department of Insurance of the State of Illinois shall disapprove of the sale of the assets which are the subject matter of this Agreement, or in the event said*115 Department shall refuse to consent to Seaboard Finance Company continuing the small loan business in the offices presently occupied by First Party, this Agreement shall be null and void, and any consideration which has been paid to the First Party by Second Party, as provided herein, shall be returned forthwith to Second Party without deduction for any cause whatsoever. Seaboard paid a premium of $39,164.18 for the assets in the office at 2400 West Madison Street, Chicago, Illinois, and amortized this sum over a period of 5 years deducting $2,610.96 in the taxable year ended September 30, 1957, and $7,832.88 in the taxable year ended September 30, 1958. Seaboard paid a premium of $51,541.04 for the assets in the office at 47th Street, Chicago, and amortized this amount over a period of 5 years. Seaboard deducted $3,436.08 in the taxable year ended September 30, 1957, and $10,308.24 in the taxable year ended September 30, 1958, as amortization of this premium. The respondent disallowed the deductions. On March 8, 1957, Seaboard entered into an agreement with Gulf Finance Company Mt. Rainier, Inc., in which Seaboard purchased certain assets consisting of: promissory notes, negotiable*116 instruments, choses in action, and papers relating and pertinent thereto such as, but without limitation, chattel mortgages, motor vehicle titles, liens, assignments and the like (all of which papers are severally and collectively hereinafter referred to as "Property") * * * Seaboard also purchased: title to ledger cards and related files pertaining to all paid in full accounts belonging to and owned by Seller * * * The parties to this contract also agreed: That for a period of one (1) year from date hereof, it will not, in competition with Buyer, solicit business in, or directly or indirectly engage in, enter into, or conduct a small loan business in the City of Mt. Rainier, Maryland, or within a ten mile radius of the greater Washington, District of Columbia metropolitan area. The president and secretary and treasurer of Gulf Finance Company Mt. Rainier, Inc., also guaranteed the performance of the provisions of the agreement as individuals. Seaboard paid for the assets of Gulf Finance Company Mt. Rainier, Inc., a premium in the amount of $41,996 which was amortized over a 5 year period. Seaboard deducted $4,199.56 in the taxable year ended September 30, 1957, and $8,399.16*117 in the taxable year ended September 30, 1958. The respondent disallowed the deductions. On April 30, 1957, Seaboard entered into an agreement with Equitable Finance Corporation, a New York corporation located in the Borough of Manhattan, New York. Seaboard purchased from Equitable Finance Corporation assets consisting of: promissory notes, negotiable instruments, choses in action, and papers relating and pertinent thereto such as, but without limitation, chattel mortgages, liens and assignments, and the like (all of which papers are severally and collectively hereinafter referred to as "Property") * * * In addition to the above assets, Seaboard acquired: title to certain ledger cards and related files pertaining to certain paid in full accounts belonging to and owned by Seller * * * Seaboard also acquired the furniture and fixtures of Equitable Finance Corporation located at its Maspeth office, 72-04 Grand Avenue, Borough of Queens, City of New York, and its Westbury office, 250 Post Avenue, Westbury, Long Island, New York. Seaboard acquired the leases of Equitable Finance Corporation for the offices mentioned. Seaboard and Equitable Finance Corporation agreed that: *118 5. (a) It is understood that the transfer of the leases and property hereinbefore referred to is subject to the prior approval of the Banking Department of the State of New York and the issuance to the Buyer of a license at the stated locations. The Seller shall have sixty days within which to obtain the approval of the Banking Department of the State of New York with reference thereto and the issuance of said licenses, and the Buyer agrees to cooperate with the Seller to obtain such approval and licenses. * * *(c) The full purchase price hereinbefore set forth shall not be paid by the Buyer to the Seller until the approval of the Banking Department and the required licenses are obtained. * * *(e) In the event Seller is unable to obtain such approval and such licenses within the sixty days hereinbefore provided, Seller shall return to the Buyer the down payment of $70,000.00, and upon the return of such payment, this contract shall come to an end and neither party shall have any obligation to the other. Seaboard paid a premium for the assets in the office located at Maspeth in the amount of $23,127 which it amortized over a 5 year period. It deducted $1,927.25 in*119 the taxable year ended September 30, 1957, and $4,625.40 in the taxable year ended September 30, 1958. The respondent disallowed the deductions. Seaboard paid a premium for the assets in the office located at Westbury of $31,873 which it amortized over a 5 year period. Seaboard amortized and deducted $2,656.04 in the taxable year ended September 30, 1957, and $6,374.52 in the taxable year ended September 30, 1958. The respondent disallowed the deductions. On November 1, 1957, Seaboard entered into an agreement with Thrift Investment Corporation, a Pennsylvania corporation and Thrift Plan Finance Corporation of Cumberland, a Maryland corporation. Seaboard acquired assets: consisting of conditional sales contracts, promissory notes, negotiable instruments, choses in action, and papers relating and pertinent thereto such as, but without limitations, chattel mortgages, motor vehicle titles, liens, assignments and the like (all of which papers are severally and collectively hereinafter referred to as "Property"), * * * In addition, Seaboard acquired: title to ledger cards and related files pertaining to all paid in full accounts belonging to and owned by Sellers * * * In addition, *120 Seaboard acquired the leasehold improvements, and furniture and fixtures of the sellers located at 18 North Liberty Street, Cumberland, Maryland. Seaboard and the sellers also agreed: That for a period of three (3) years from date hereof, they will not, in competition with Buyer, solicit business in, or directly or indirectly engage in, enter into, or conduct a similar or competitive business in the City of Cumberland, Maryland. One of the Sellers, Thrift Investment Corporation, recognized that the other Seller, Thrift Plan Finance Corporation of Cumberland, may be dissolved and that in this manner the value of the latter's warranties and covenants may thereby be impaired in the hands of the Buyer. Thrift Investment Corporation therefore agrees that, in consideration of the purchases effected by the terms of this Agreement, it will be and remain firmly bound as guarantor for the full and faithful performance of all of the provisions, terms, conditions, warranties and representations herein contained. Seaboard paid a premium to the sellers under the agreement in the amount of $8,393.74 which was amortized over a period of 5 years. In the taxable year ended September 30, 1958, Seaboard*121 amortized and deducted $1,538.90. The respondent disallowed the deduction. 2. Seaboard Finance Company, Transferee, Docket No. 1757-62 Petitioner has agreed that Seaboard Finance Company, Docket No. 1757-62, is a transferee of the assets of Seaboard Finance Company, Inc. (Massachusetts), Docket No. 1771-62, and as such transferee, is liable for any deficiency in income tax due from Seaboard Finance Company, Inc. (Massachusetts), for the taxable years ended September 30, 1957, and September 30, 1958. To the extent that Seaboard Finance Company, Transferee, Docket No. 1757-62, pays any deficiency determined to be due herein from the transferor, it is stipulated that the transferor will not be liable for that same tax. Petitioner also agrees that the statute of limitations has not expired for the taxable year ended September 30, 1957, insofar as the transferee liability of Seaboard Finance Company, transferee, Docket No. 1757-62, is concerned for any tax liability due from the transferor, Seaboard Finance Company, Inc. (Massachusetts), Docket No. 1771-62. It has been stipulated that Seaboard allocated and transferred to Seaboard Finance Company, Inc. (Massachusetts) $136,510.36*122 of the premium in connection with a transfer of assets to such subsidiary. Seaboard Finance Company, Inc. (Massachusetts), Docket No. 1771-62, is a transferor in this case. The transferor amortized and deducted as premium the amount of $11,612.15 in the taxable year ended September 30, 1957, and the amount of $27,869.16 in the taxable year ended September 30, 1958. These amounts were disallowed by the respondent. 3. Seaboard Finance Company of Lynwood, Docket 1758-62 Seaboard Finance Company of Lynwood is a California corporation. It filed its Federal method of accounting. Its address on its Federal income tax return is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. It was incorporated on April 6, 1953. Eight days later, on April 14, 1953, Seaboard Finance Company of Lynwood entered into an agreement with Acceptance Finance Company, a Missouri corporation, doing business as Trust Finance Company in Lynwood, California. Seaboard Finance Company of Lynwood purchased assets of Acceptance Finance Company consisting of promissory notes, negotiable instruments, choses in action, and papers relating thereto such as chattel mortgages, motor vehicle titles, *123 liens, assignments and the like. Seaboard Finance Company of Lynwood also purchased the furniture and fixtures and for these assets paid $204,895.33, of which $2,219.88 was paid for the furniture and fixtures and the balance for the other assets. Acceptance Finance Company assigned its lease on the office space it occupied in Lynwood, California, to Seaboard Finance Company of Lynwood who assumed the obligation of the lease for the remainder of its term. Seaboard Finance Company of Lynwood paid $33,791.40 in consideration for which Acceptance Finance Company agreed: a. That it will not, in competition with Second Party, solicit or pay off any account listed on Schedule A hereof. b. That for a period of three (3) years from the date hereof, it will not solicit business in or directly or indirectly engage in, enter into, or conduct a similar or competitive business in the City of Lynwood, California. Seaboard Finance Company of Lynwood allocated the $33,791.40 paid to an account described as "Premiums Paid on Purchased Accounts." The $33,791.40 was amortized over a period of 3 years. The only year before the Court is the taxable year ended September 30, 1956, and the petitioner*124 amortized and deducted $5,631.91 in that year which the respondent has disallowed. Except for the $5,631.91, all of the $33,791.40 has been amortized and deducted in taxable years ending on or before September 30, 1955. The amount stated in the contract as being paid for a covenant not to compete was actually paid for the loan contracts. 4. Seaboard Finance Company of Monterey, Docket No. 1759-62 Seaboard Finance Company of Monterey was incorporated in the State of California on July 22, 1957. The address on its return is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. It filed its return on the accrual method of accounting for the taxable year ended September 30, 1958, and it filed its Federal income tax return with the district director of internal revenue, Los Angeles, California. Nine days after Seaboard Finance Company of Monterey was incorporated, it purchased on July 31, 1957, from Rapid Thrift Company, Inc., a California corporation located at 452 Alvarado Street, Monterey, California, assets consisting of: conditional sales contracts, promissory notes, negotiable instruments, choses in action, and papers relating and pertinent thereto*125 such as, but without limitation, chattel mortgages, motor vehicles titles, liens, assignments and the like (all of which papers are severally and collectively hereinafter referred to as "Property"), * * * In addition, it acquired: title to ledger cards and related files pertaining to all paid in full accounts belonging to and owned by Seller * * * Seaboard Finance Company of Monterey also purchased furniture and fixtures of Rapid Thrift Company, Inc., located at 452 Alvarado Street, Monterey, California, and acquired the lease of Rapid Thrift Company, Inc., at that address. For the same consideration paid for the above property, Rapid Thrift Company, Inc., by its president and secretary-treasurer agreed: That for a period of three (3) years from date hereof, it will not, in competition with Buyer, solicit business in, or directly or indirectly engage in, enter into, or conduct a similar or competitive business in the City of Monterey, California. The amount stated in the contract as being paid for a covenant not to compete was actually paid for the loan accounts. The following table shows the first 2 years net income reported by the petitioner and the loans made by it: *126 Net IncomeTYEReportedLoans Made9-30-57[3,477.66)$222,089.589-30-588,227.33692,997.75Petitioner allocated $5,441.04 of the price paid under the agreement to an account described as "Premiums Paid on Purchased Accounts." The $5,441.04 was amortized over a period of 3 years. In the year ended September 30, 1957, the petitioner amortized and deducted $302.28. In the taxable year ended September 30, 1958, the petitioner amortized and deducted the sum of $1,813.68. The respondent disallowed the deduction of the amortization by the petitioner in the year ended September 30, 1958, which is the only year before the Court. 5. Seaboard Finance Company of Northern California, Docket No. 1760-62. Seaboard Finance Company of Northern California was incorporated on January 20, 1955, in the State of California. It filed its Federal income tax returns in Los Angeles, California, on the accrual method of accounting. The address on the returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. On April 28, 1956, Seaboard Finance Company of Northern California entered into an agreement with Alfred G. Barnett and Jess H. Barnett, *127 doing business as Barnett Car Company, Fresno, California. Seaboard Finance Company of Northern California purchased assets consisting of: conditional sales contracts, promissory notes, negotiable instruments, choses in action, and papers relating and pertinent thereto such as, but without limitations, chattel mortgages, motor vehicle titles, liens, assignments and the like (all of which papers are severally and collectively hereinafter referred to as "Property") * * * In addition to these assets, the petitioner purchased: title to ledger cards and related files pertaining to all paid in full accounts belonging to and owned by First Party shall be deemed and held to have been transferred, sold and set over by First Party to Second Party in full and perfect ownership under the provisions of this Agreement, and the term "Property" as and when used in this Agreement shall be deemed to include all such ledger cards and related files. Seaboard Finance Company of Northern California purchased the furniture and fixtures of the seller located at 2424 Stanislaus Street, Fresno, California. In addition, for the same consideration paid by Seaboard Finance Company of Northern California*128 for the above-described property, the seller agreed: that for a period of two (2) years from date hereof, it will not, in competition with Second Party, solicit business in, or directly or indirectly engage in, enter into, or conduct a similar or competitive business in the City of Fresno, California. Petitioner allocated $21,894.93 of the amount so paid under said agreement to an account described as "Premiums Paid on Purchased Accounts." The amount was amortized over a 3 year period. $3,040.95 of said amount was amortized and deducted in the period May to September 1956 which is not before the Court. In each of the taxable years ended September 30, 1957, and September 30, 1958, the petitioner amortized and deducted $7,298.28. The respondent disallowed the deductions in the taxable years ended September 30, 1957, and September 30, 1958. On February 20, 1957, Seaboard Finance Company of Northern California entered into an agreement with Redwood Thrift of California, purchasing assets consisting of: promissory notes, negotiable instruments, choses in action, and papers relating and pertinent thereto such as, but without limitation, chattel mortgages, motor vehicle titles, liens, *129 assignments and the like (all of which papers are severally and collectively hereinafter referred to as "Property") * * * In addition, Seaboard Finance Company agreed to pay $8,695.51 in consideration of which Redwood Thrift of California agreed: that for a period of three (3) years from date hereof, it will not, in competition with Second Party, directly solicit or directly or indirectly pay off any account listed on "Schedule A," B & C hereto. The amount paid in the contract for the covenant not to compete was actually for the premium on purchased accounts and the contract was written that way because: The seller was operating a number of offices in northern California, and still is. Here, again, we felt that we had more protection from the standpoint of competition or solicitation of the accounts that we had purchased from the seller, by the seller, that we assigned the amount of the premium to the noncompete covenant. Redwood Thrift of California agreed that it would repurchase the property from Seaboard Finance Company if it could not obtain a small loan license as follows: * * * First Party agrees to re-purchase from Second Party, the full purchase price paid for*130 such property, less the amount of principal collected thereon by Second Party, any such property which Second Party is unable to collect by reason of the fact that Second Party is not now nor will be a licensee under said Industrial Loan Law. Petitioner allocated $7,867.40 of the amount so paid under said agreement to an account described as "Premiums Paid on Purchased Accounts." The $7,867.40 was written off over a period of 3 years. In the taxable years ended September 30, 1957, and September 30, 1958, the petitioner amortized and deducted $1,529.78 and $2,622.48, respectively. The respondent disallowed the deductions. The following table shows in Schedule F, Bad Debts, the first 3 years net income reported for those years on its Federal income tax return and loans made by the petitioner: TYENet Income ReportedLoans Made9-30-56[3,349.03)$ 605,442.949-30-57843.06815,478.749-30-582,686.381,126,412.946. Seaboard Finance Company of Colorado Springs, Docket No. 1761-62. Seaboard Finance Company of Colorado Springs was incorporated on December 6, 1954, in the State of Colorado. It filed its Federal income tax returns in Los Angeles, California, *131 on the accrual method of accounting. The address on its returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. On the same day that it was incorporated Seaboard Finance Company of Colorado Springs entered into four agreements with Crown Finance Company of Colorado Springs, Fidelity Acceptance Company, Fidelity Finance Company of Colorado Springs and Family Industrial Bank. Each of these agreements is substantially like the contract entered into with Crown Finance Company of Colorado Springs. Seaboard Finance Company of Colorado Springs purchased assets from Crown Finance Company of Colorado Springs consisting of: promissory notes and/or lien instruments securing the same, consisting of mortgages and Trust Deeds upon real and personal property, motor vehicles, assignments of contracts to purchase realty, sales contracts and other similar types of liens (all of which instruments are severally and collectively hereinafter referred to as "Property") * * * Seaboard Finance Company of Colorado Springs purchased the furniture and fixtures of Crown Finance Company of Colorado Springs located at 1 E. Colorado Avenue. Seaboard Finance Company of Colorado*132 Springs agreed to take over the lease of Crown Finance Company at 1 E. Colorado Avenue, Colorado Springs. The parties agreed that: * * * Second Party's obligations hereunder are contingent upon obtaining the consent of the landlord to such assignment of lease if necessary. As a further consideration, Seaboard Finance Company of Colorado Springs paid Crown Finance Company the sum of $33,969.72 (other amounts were stated in the other three contracts) in consideration of which Crown Finance Company: does hereby agree that it will not, for a period of three (3) years from date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second Party; that as to any paid up accounts of First Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. An addenda was added to said agreement reading as follows: CROWN FINANCE CO. OF COLORADO SPRINGS as First Party hereto agrees for a period of two (2) years from date hereof it will*133 not maintain a loan office for the making of loans by it in the City of Colorado Springs, Colorado or within a radius of twenty-five (25) miles therefrom, provided that the foregoing shall not apply to the purchase of dealers' receivables nor the making of loans by First Party to residents of Colorado Springs or within a radius of twenty-five (25) miles therefrom (unless otherwise herein prohibited) from an office or offices maintained by First Party in a city other than Colorado Springs, Colorado. The amount stated in the contract as being paid for a covenant not to compete was actually paid for the loan accounts. Of the price paid, $34,793.53 was allocated to an account described as "Premiums Paid on Purchased Accounts" and was amortized over a 3 year period. All of the amount, except $14,497.24, had been written off prior to the taxable year ended September 30, 1957. In the taxable year ended September 30, 1957, $11,597.88 was amortized and deducted and in the taxable year ended September 30, 1958, $2,899.36 was amortized and deducted. The respondent disallowed the deductions. The following table shows the first 4 years net income reported on its Federal income tax return*134 and loans made by the petitioner: TYENet Income ReportedLoans Made9-30-55$ 8,672.25$ 348,367.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,890.93842,045.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,732.47981,049.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,117.561,740,487.007. Seaboard Finance Company of Denver, Two, Docket No. 1762-62 Seaboard Finance Company of Denver, Two, was incorporated on December 6, 1954, in the State of Colorado. It filed its Federal income tax returns in Los Angeles, California, on the accrual method of accounting. The address on its returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. On the same day that it was incorporated, Seaboard Finance Company of Denver, Two, entered into three agreements with Economy Finance Company, Fidelity Acceptance Corporation, and Fairway Finance Company. Each of these agreements is substantially like the other. Seaboard Finance Company of Denver, Two, purchased assets from Fairway Finance Company, consisting of: promissory notes and/or lien instruments securing the same, consisting of mortgages and Trust Deeds upon real and personal property, motor vehicles, assignments of contracts to purchase realty, sales contracts and other*135 similar types of liens (all of which instruments are severally and collectively hereinafter referred to as "Property") * * * Seaboard Finance Company of Denver, Two, also purchased the furniture and fixtures of Fairway Finance Company at 1801 Welton, Street, Denver, Colorado. Seaboard Finance Company of Denver, Two, agreed to take over the lease of Fairway Finance Company at 1801 Welton Street, Denver Colorado. The parties agreed that: Second Party's obligations hereunder are contingent upon obtaining the consent of the landlord to such assignment of lease if necessary. As a further consideration, Seaboard Finance Company of Denver, Two, paid Fairway Finance Company the sum of $33,745.75 (other amounts were stated in the other contracts) in consideration of which Fairway Finance Company: does hereby agree that it will not, for a period of three (3) years from the date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second Party; that as to any paid up accounts of First Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, *136 however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. About two and a half months later, on February 15, 1955, Seaboard Finance Company of Denver, Two, entered into an agreement with Modern Finance Company, Midwest Finance Company, Safeway Finance Company, State Finance Company, Crown Finance Company of Colorado Springs, Steel City Finance Company, Time Finance Company, Fidelity Finance Company of Colorado Springs, and Family Finance Company of Englewood, respectively. This agreement is essentially the same as the agreement entered into with Fairway Finance Company set forth above insofar as the items purchased. However, under this agreement no furniture and fixtures were purchased. Also, under this agreement no lease was taken over by Seaboard Finance Company of Denver, Two. As a further consideration, Seaboard Finance Company of Denver, Two, paid the numerous sellers in this contract $56,067.93 in consideration of which each of the sellers agreed that: it will not, for a period of three (3) years from date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second*137 Party; that as to any paid up accounts of First Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. The amount stated in the contracts as being paid for a covenant not to compete was actually paid for the loan accounts. Petitioner allocated $91,715.25 of the price paid under all the contracts to an account described as "Premiums Paid on Purchased Accounts." The $91,715.25 was deducted in the following years and the following amounts: 9-30-55$20,006.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,589.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,589.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,529.38 The year ended September 30, 1955, is not before the Court. The respondent disallowed the deductions in the taxable years ended September 30, 1956, 1957, and 1958. The following table shows the first 4 years net income reported on its Federal income tax returns and loans made by petitioner: TYENet Income ReportedLoans Made9-30-55$16,689.71$ 314,668.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,614.51841,385.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,372.891,136,714.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,712.281,284,021.00*138 8. Seaboard Finance Company of Denver, Three, Docket No. 1763-62. Seaboard Finance Company of Denver, Three, was incorporated on December 6, 1954, in the State of Colorado. It filed its Federal income tax returns in Los Angeles, California, on the accrual method of accounting. The address on its returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. On the same day that it was incorporated, Seaboard Finance Company of Denver, Three, entered into an agreement with Imperial Finance Company and Time Finance Company, respectively. Each of such agreements is substantially like the other. Seaboard Finance Company of Denver, Three, purchased assets from Time Finance Company consisting of: promissory notes and/or lien instruments securing the same, consisting of mortgages and Trust Deeds upon real and personal property, motor vehicles, assignments of contracts to purchase realty, sales contracts and other similar types of liens (all of which instruments are severally and collectively hereinafter referred to as "Property") * * * No furniture and fixtures were purchased from Time Finance Company. Seaboard Finance Company of Denver, Three, agreed*139 to take over the lease of Time Finance Company, 101 Broadway Street, Denver, Colorado. The parties agreed that: Second Party's obligations hereunder are contingent upon obtaining the consent of the landlord to such assignment of lease if necessary. As a further consideration, Seaboard Finance Company of Denver, Three, paid Time Finance Company the sum of $2,189.80 (another amount was stated in the contract with Imperial Finance Company) in consideration of which Time Finance Company: does hereby agree that it will not, for a period of three (3) years from date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second Party; that as to any paid up accounts of First Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. The amount stated in the contracts as being paid for a covenant not to compete was actually paid for the loan accounts. Petitioner allocated $40,305.97 of the price paid under such agreements to*140 an account described as "Premiums Paid on Purchased Accounts." The taxpayer amortized and deducted the $40,305.97 on a 3 year basis and over the taxable years as follows: 9-30-56$13,380.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,380.009-30-583,345.11 The respondent disallowed the deductions. The balance of the amortization had been deducted in a year prior to September 30, 1956, which is the first year before the Court. The following table shows the first 4 years net income reported on its Federal income tax return and loans made by petitioner: TYENet Income ReportedLoans Made9-30-55$ 7,913.14$338,980.009-30-569,818.45681,058.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,117.73517,176.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,121.12667,437.009. Seaboard Finance Company of Denver, Four, Docket No. 1764-62. Seaboard Finance Company of Denver, Four, was incorporated on December 6, 1954, in the State of Colorado. It filed its Federal income tax returns in Los Angeles, California, on the accrual method of accounting. The address on its returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. On the same day that it was incorporated, Seaboard Finance Company of Denver, *141 Four, entered into an agreement with Roosevelt Finance Company and Family Finance Company, respectively. Each of such agreements is substantially like the other. No furniture and fixtures were purchased from Family Finance Company. Seaboard Finance Company of Denver, Four, purchased assets from Family Finance Company consisting of: promissory notes and/or lien instruments securing the same, consisting of mortgages and Trust Deeds upon real and personal property, motor vehicles, assignments of contracts to purchase realty, sales contracts and other similar types of liens (all of which instruments are severally and collectively hereinafter referred to as "Property") * * * Seaboard Finance Company of Denver, Four, agreed to take over the lease of Family Finance Company, 1513 South Broadway Street, Englewood, Colorado. The parties agrees that: Second Party's obligations hereunder are contingent upon obtaining the consent of the landlord to such assignment of lease, if necessary. As a further consideration, Seaboard Finance Company of Denver, Four, paid Family Finance Company the sum of $5,549.15 (another amount was stated in the contract with Roosevelt Finance Company) in consideration*142 of which Family Finance Company: does hereby agree that it will not, for a period of three (3) years from date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second Party; that as to any paid up accounts of First Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. The amount stated in the contracts as being paid for a covenant not to compete was actually paid for the loan accounts. Petitioner allocated $34,424.53 of the price paid under such agreements to an account described as "Premiums Paid on Purchased Accounts." The petitioner amortized and deducted $34,424.53 over a 3-year period. In the taxable years, the amortization was as follows: 9-30-56$11,425.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,425.569-30-582,856.36 The respondent disallowed the deductions. The balance of the $34,424.53 has been deducted in a year prior to the year ended September 30, 1956, which is the first year before the Court. The following*143 table shows the first 4 years net income reported on its Federal income tax return and loans made by petitioner. TYENet Income ReportedLoans Made9-30-55$ 5,177.16$214,580.009-30-564,350.74492,884.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,711.82510,997.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,544.43536,239.0010. Seaboard Finance Company of Denver, Five, Docket No. 1766-62. Seaboard Finance Company of Denver, Five, was incorporated on February 17, 1955, in the State of Colorado. It filed its Federal income tax returns in Los Angeles, California, on the accrual method of accounting. The address on the returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. Three days before it was incorporated, Seaboard Finance Company of Denver, Five, entered into an agreement with Fidelity Finance Company of Denver, Loans, Inc., and Economy Finance Company, Denver, Colorado. Two days after the date of incorporation, on February 19, 1955, Seaboard Finance Company of Denver, Five, entered into an agreement with Valley Finance Company, Family Finance Company of Denver, Workmans Finance Company, Frontier Finance Company, Fidelity Finance Company of Denver, Family Finance Company*144 of Pueblo, Fidelity Finance Company of Pueblo, Franklin Finance Company, State Loan & Finance Company, and Fairway Finance Company. Each of these agreements is the same, with the exception of the blank spaces in the contract which contain different inserts. Seaboard Finance Company of Denver, Five, purchased assets from the above-named companies consisting of: promissory notes and/or lien instruments securing the same, consisting of mortgages and Trust Deeds upon real and personal property, motor vehicles, assignments of contracts to purchase realty, sales contracts and other similar types of liens (all of which instruments are severally and collectively hereinafter referred to as "Property") * * * Seaboard Finance Company of Denver, Five, also purchased furniture and fixtures located at 1039 - 15th Street, Denver, Colorado, from all of the above sellers named in the contract of February 19, 1955. Seaboard Finance Company of Denver, Five, also purchased furniture and fixtures located at 901 - 14th Street, Denver, Colorado, from the sellers mentioned in the agreement dated February 14, 1955. In each of the contracts mentioned above, Seaboard Finance Company of Denver, Five, *145 took over the lease of the sellers and agreed that: Second Party's obligations hereunder are contingent upon obtaining the consent of the landlord to such assignment of lease, if necessary. As a further consideration, Seaboard Finance Company of Denver, Five, paid to the sellers in the contract dated February 14, 1955, and the contract dated February 19, 1955, $26,836.97 and $71,863.49, respectively, in consideration of which the sellers do: hereby agree that it will not, for a period of three (3) years from date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second Party; that as to any paid up accounts of First Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. The amount stated in the contracts as being paid for a covenant not to compete was actually paid for the loan accounts. Petitioner allocated $98,444.30 of the amount paid under all of such agreements to an account described as "Premiums Paid*146 on Purchased Accounts." The $98,444.30 was amortized and deducted over a 3-year period. The amortization claimed in the taxable years was as follows: 9-30-56$32,900.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,900.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,452.22 The respondent disallowed the deductions. The balance of the $98,444.30 was written off in a year prior to the taxable year ended September 30, 1956, which is the first year before the Court. The following table shows the first 4 years net income reported on its Federal income tax return and loans made by the petitioner in those years: TyeNet Income ReportedLoans Made9-30-55$21,344.34$254,708.009-30-56(3,299.60)703,600.009-30-57(7,668.13)561,339.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,161.89738,851.0011. Seaboard Finance Company of Pueblo, Two, Docket No. 1767-62 Seaboard Finance Company of Pueblo, Two, was incorporated on December 6, 1954, in the State of Colorado. It filed its Federal income tax returns in Los Angeles, California, on the accrual method of accounting. The address on the returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. On the same day that it was incorporated, Seaboard Finance*147 Company of Pueblo, Two, entered into nine agreements with Economy Finance Company, Crown Finance Company of Pueblo, Family Finance Company of Pueblo, Fidelity Acceptance Corporation, Fidelity Finance Company of Pueblo, Steel City Finance Company, Steel Town Finance Company, and Valley Finance Company of Pueblo, respectively. Each of the agreements is substantially like the other. Seaboard Finance Company of Pueblo, Two, purchased assets from the above-named companies consisting of: promissory notes and/or lien instruments securing the same, consisting of mortgages and Trust Deeds upon real and personal property, motor vehicles, assignments of contracts to purchase realty, sales contracts and other similar types of liens (all of which instruments are severally and collectively hereinafter referred to as "Property") * * * It also acquired the furniture and fixtures located at 425 North Santa Fe, Pueblo, Colorado, (under the other contracts, a different location was involved). Seaboard Finance Company of Pueblo, Two, took over the leases of the sellers, the one involved in this contract was at 425 North Santa Fe Street, Pueblo, Colorado, and agreed that: Second Party's obligations*148 hereunder are contingent upon obtaining the consent of the landlord to such assignment of lease. As a further consideration, Seaboard Finance Company of Pueblo, Two, paid to the Valley Finance Company of Pueblo (other sums were paid to the other sellers involved in the other contracts) $16,386.31 in consideration of which the seller agreed: that it will not, for a period of three (3) years from date hereof solicit or pay off any of the accounts listed in Schedule "A" hereof which are being purchased by Second Party (a list of which is being furnished Second Party) First Party will not use such lists for specific solicitation of such paid up accounts, provided, however, that the foregoing shall not apply to general mailings or solicitations which may be made by First Party. In addition, Valley Finance Company of Pueblo agreed to the following addenda to the contract: Valley Finance Co. of Pueblo as First Party hereto agrees that it will not, for a period of two years, operate or maintain a downtown office in Pueblo, Colorado, for the making of loans or the collection of its remaining receivables not being purchased by Second Party. The term "downtown office" as used herein shall*149 be defined to mean a loan office within a radious of ten (10) blocks from 425 North Santa Fe. Pueblo, Colorado. The amount stated in the contracts as being paid for a covenant not to compete was actually paid for the loan accounts. Petitioner allocated $60,130.37 of the price paid under such agreements to an account described as "Premiums Paid on Purchased Accounts." The $60,130.37 was amortized and deducted over the following periods and in the following amounts: 9-30-55$15,278.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,961.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,961.169-30-584,929.57 The amount amortized in the year prior to the taxable year ended September 30, 1956, is not before the Court. The respondent disallowed the deductions for the taxable years before the Court. The following table shows the first 4 years net income reported on its Federal income tax return and loans made by the petitioner in those years: TyeNet Income ReportedLoans Made9-30-55$ 8,934.91$387,130.009-30-567,412.08620,691.009-30-57$22,363.05$560,297.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,304.65606,084.0012. Seaboard Finance Company of Connecticut, Inc., Docket No. 1768-62 Seaboard Finance Company of Connecticut, *150 Inc., was incorporated in the State of Connecticut. The address on its returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. It prepared its Federal income tax returns on the accrual basis of accounting for the taxable years involved and filed them with the district director of internal revenue at Los Angeles, California. It has been stipulated that Seaboard Finance Company (Parent) allocated or transferred to Seaboard Finance Company of Connecticut, Inc., assets to which a premium of $217,819.81 was allocated. Seaboard Finance Company of Connecticut, Inc., amortized and deducted the amount of $25,374.23 in the taxable year ended September 30, 1957, $43,498.68 in the taxable year ended September 30, 1958, and $43,498.68 in the taxable year ended September 30, 1959. The disallowance of such amortization by the respondent resulted in the reduction of the operating losses for the taxable years ended September 30, 1958, and September 30, 1959, which were carried back as net operating loss deductions to the taxable year December 1, 1954, to September 30, 1955, and the taxable years ended September 30, 1956, and September 30, 1957. The petitioners have*151 claimed and have been allowed a tentative allowance for a net operating loss carry-back from taxable years ended September 30, 1958, and September 30, 1959, which has been denied in the deficiency notice in this case and which denial results, in part, in the deficiencies determined by respondent herein. Petitioners and respondent have stipulated that to the extent the Court finds that the amortization deductions are allowable or are not allowable, the parties will make the appropriate adjustments in the net operating loss carry-backs. 13. Seaboard Finance Company (Idaho), Docket No. 1769-62 Seaboard Finance Company (Idaho) was incorporated in the State of Idaho on August 29, 1955. The address on its return is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. It filed its Federal income tax return on the accrual method of accounting for the taxable year ended September 30, 1958, and it filed its Federal income tax return with the district director of internal revenue, Los Angeles, California. It has been stipulated that Seaboard Finance Company (Parent) and Seaboard Finance Company (Idaho) entered into an agreement with National Finance Corporation*152 and that $1,051,324.39 of the net assets and $116,784.99 of the premium was transferred to Seaboard Finance Company (Idaho). Petitioner allocated said $116,784.99 paid to an account described as "Premiums Paid on Purchased Accounts" and amortized it over a 5-year period. In the taxable year ended September 30, 1958, the petitioner deducted as amortization the sum of $23,357 which was disallowed by the respondent. 14. Seaboard Finance Company of Terre Haute, Inc., Docket No. 1770-62 Seaboard Finance Company of Terre Haute, Inc., was incorporated on May 7, 1948, in the State of Indiana. The address on its return for the taxable year ended September 30, 1958, is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. It filed its Federal income tax return for that year on the accrual basis of accounting with the district director of internal revenue, Los Angeles, California. On October 18, 1957, Seaboard Finance Company (Parent) entered into an agreement with Security Loan Company, an Indiana corporation located at 316 Star Building, Terre Haute, Indiana. The agreement provides, in part, for the exchange of the stock of Seaboard Finance Company (Parent) *153 for the stock of Security Loan Company. Thereafter the acquired corporation was dissolved and the assets were transferred to Seaboard Finance Company of Terre Haute. Prior to its acquisition by Seaboard Finance Company (Parent), Security Loan Company had acquired the assets of three other small loan concerns. In the taxable year ended September 30, 1958, the petitioner deducted the amount of $1,816.20 as amortization of premium paid. This deduction was disallowed by the respondent. The petitioner had claimed a net operating loss carry-back from the year ended September 30, 1958, to the taxable year ended September 30, 1955, of $78,044.03. After the above disallowance of the premium, the net operating loss carry-back was reduced to $76,227.83. The petitioner had claimed a tentative carry-back adjustment which, upon being disallowed, results in the deficiency determined by respondent herein for the taxable year ended December 31, 1955, in the amount of $887.37. 15. Seaboard Finance Company, Inc. (Massachusetts), Docket No. 1771-62 Seaboard Finance Company, Inc. (Massachusetts) was incorporated in the State of Massachusetts on December 10, 1953. Its address on its Federal income*154 tax returns is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. Its returns were prepared on the accrual basis of accounting and were filed with the district director of internal revenue, Los Angeles, California. Seaboard Finance Company, Inc. (Massachusetts) was a subsidiary corporation of Seaboard Finance Company (Parent). After Seaboard Finance Company (Parent) acquired the assets of American National Finance Company and liquidated the subsidiary corporations of that company, Seaboard Finance Company (Parent) allocated and transferred to Seaboard Finance Company, Inc. (Massachusetts) $136,510.36 of the premium in connection with the transfer of certain assets to that subsidiary. Seaboard Finance Company, Inc. (Massachusetts) amortized and deducted $11,612.15 in the taxable year ended September 30, 1957, and $27,869.16 in the taxable year ended September 30, 1958. The respondent disallowed these amounts and the deficiency resulting from this disallowance has been asserted against Seaboard Finance Company, Docket No. 1957-62, and it has been agreed that Seaboard Finance Company, Docket No. 1957-62, is a transferee of assests of Seaboard Finance Company, *155 Inc. (Massachusetts) and as such is liable for any tax liability owing by Seaboard Finance Company, Inc. (Massachusetts). The notice of deficiency in the case of Seaboard Finance Company, Inc. (Massachusetts) asserts a deficiency only for the year ended September 30, 1958, while the deficiency for the transferee, Seaboard Finance Company, Docket No. 1757-62, asserts liability due from the transferee for the taxable year ended September 30, 1957, and September 30, 1958. The respondent has an additional year in which to assert a deficiency against the transferee and it has been stipulated that the statute of limitations has not expired for the taxable year ended September 30, 1957, insofar as the transferee liability of Seaboard Finance Company, transferee, Docket No. 1757-62, is concerned for any tax liability due from the transferor, Seaboard Finance Company, Inc. (Massachusetts), Docket No. 1771-62. 16. Seaboard Finance Company of Flint, Docket No. 1772-62 Seaboard Finance Company of Flint was incorporated on January 30, 1957, in the State of Delaware. The address on its return is c/o Seaboard Finance Company, 945 South Flower Street, Los Angeles, California. It prepared its*156 Federal income tax return for the taxable year ended September 30, 1958, on the accrual method of accounting and filed that return with the district director of internal revenue, Los Angeles, California. One day after Seaboard Finance Company of Flint was incorporated and on January 31, 1957, it entered into an agreement with Michigan Finance Corporation, a Michigan corporation. Under this agreement Seaboard Finance Company of Flint purchased accounts set forth in Schedule "A" of the agreement. Seaboard Finance Company of Flint also acquired the office of Michigan Finance Corporation, 4614 North Saginaw Street, Flint, Michigan. In addition, Seaboard Finance Company of Flint, was to acquire: 5. That in addition to the accounts listed in Schedule "A", the Purchaser is to acquire any and all accounts charged off by the Seller as uncollectible prior to January 18, 1957, and the Purchaser shall also acquire as its property all paid-in-full account records located at the Seller's place of business, 4614 North Saginaw Street, Flint, Michigan. Seaboard Finance Company of Flint and Michigan Finance Corporation also agreed: 6. That in the event the Purchaser is unable to obtain a lease*157 at 4614 North Saginaw Street. Flint, Michigan, or is unable to get a small loan license, then, in either of such events, this agreement will be terminated without obligation or compensation to either party. The following table shows the first 2 years net income reported on its Federal income tax return and loans made by the petitioner: TYENet Income ReportedLoans Made9-30-57[4,596.05)$236,472.009-30-589,630.61468,860.00Petitioner allocated $39,246.97 of the price paid under the agreement to an account described as "Premiums Paid on Purchased Accounts." The $39,246.97 was amortized over a 5 year period. In the taxable year ended September 30, 1958, the petitioner amortized and deducted the amount of $7,849.44 which was disallowed by the respondent. III. Facts Relating to Expenses in Connection with Nontaxable Stock Dividend During its taxable year ended September 30, 1958, Seaboard Finance Company (Parent) incurred and paid expenses in the amount of $10,791.63 in connection with the issuance of a nontaxable stock dividend. Such expenses consisted primarily of stationery and printing costs, postage, stock exchange listing fees, and transfer*158 agent and registrar expenses and fees. The total amount was deducted by Seaboard in its Federal income tax return for the taxable year in issue in determining its net income subject to tax. Respondent disallowed the deduction asserting that the total amount expended was a capital expenditure. Ultimate Findings Petitioners acquired small loan businesses for a consideration in excess of the face amounts of loan contracts and the value of other assets. Seventy percent of the excess consideration paid over the sellers' net book value of the assets sold was attributable to the small loan contracts and 30 percent of the excess consideration was paid for goodwill and going concern value of the small loan businesses acquired. The purchased loan contracts were separate individual, enforceable and legally binding contracts and do not constitute an indivisible and undepreciable asset having an indefinite life. That part (70 percent) of the amounts paid for the loan contracts is subject to amortization. The secured loan contracts purchased had useful lives of 3 years. The unsecured loan contracts purchased had useful lives of 5 years. Opinion The dispute between the parties in these consolidated*159 proceedings arises from the acquisition by Seaboard Finance Company and its subsidiaries of numerous small loan companies. The amounts paid for these loan companies were in excess of the face amounts of the loan contracts which the companies had outstanding with their customers and the value of other assets acquired with the businesses. Here, as is often the case, the petitioners have acquired some or all of the assets of sellers. Respondent argues that the aggregate assets of the sellers, exclusive of goodwill and going concern value, have a value less than the price paid and that Seaboard paid the excess for the goodwill and going concern value which cannot be depreciated. Seaboard denies that it paid any amount for goodwill or going concern value. It and the other petitioners contend that the excess value, or premium as they call it, was paid solely for the loan accounts and that they acquired an intangible asset with a definite life which could be amortized over a period of 3 years or 5 years. The issue is thus narrowed to the specific question of whether or not the petitioners paid any part of the excess consideration for goodwill and going concern value. This question is purely*160 one of fact which must be determined from the evidence presented. Both parties refer us to the time-honored definition of goodwill, enunciated by Mr. Justice Story and adopted by the Supreme Court in Metrolpolitan National Bank of New York v. St. Louis Post Dispatch, 149 U.S. 436, 446 (1893): [Goodwill is] the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices. See also Boe v. Commissioner, 307 F. 2d 339 (C.A. 9, 1962), affirming, 35 T.C. 720 (1961), where the Ninth Circuit said: "To us the essence of goodwill is the expectancy of continued patronage, for whatever reason." The crux of these cases is for what did petitioners pay*161 the premiums here in issue. Were they, as petitioners contend, for the loan contracts; or were they, as respondent contends, for location, personnel, licenses, names, a saving of time and money encompassed by the terms "start up costs" and "going concern value," customer structure and expectancy of continued patronage, old established companies in the loan business, and goodwill? The only witnesses on this principal issue, whose testimony was uncontradicted and unimpeached, were presented by petitioners. Both Weidman and Lide, men of long experience in the consumer finance business, testified that the particular loan accounts purchased ranged in value from as little as 25 percent of the principal amount owed to as much as 130 percent or more of that amount. Both witnesses were competent to testify as to the value. Respondent has produced no testimony, oral or written, to contradict their statements. Weidman and Lide described in detail the method used by Seaboard (a method commonly used in the consumer finance industry) for determining value of the loan contracts. This was described as "spreading" *162 the accounts. In spreading accounts the person charged with the responsibility for determining value examined every single loan contract together with the supporting file. The credit record of the borrower, his employment, his family situation, his payment record, and any other pertinent and available information was reviewed as to each contract. Consideration was given to the possibility of a renewal, to the effective yield on the contract under the applicable State law, and to the balance due. On the basis of such individual contract examination the value of each contract was determined. From the individual values so determined the aggregate amount which Seaboard was prepared to pay was computed. We have set out in detail in our findings of fact the method used for computing the premiums paid. While the detailed testimony of Seaboard's witnesses and the corroborating portions of documentary evidence submitted do not weave into a harmonious tapestry, the unrefined truth seldom does. But we are nevertheless persuaded that the evidence is more than sufficient to demonstrate affirmatively that Seaboard paid a substantial part of the amounts in question as premiums on the purchased*163 loan contracts. Evidence on the negative corollary is no less persuasive. Seaboard made no investigation or evaluation, prior to purchase, of the employees of the sellers. Investigation was made as to the head office personnel in two of the purchases for the purpose of determining whether Seaboard would assume liability to retain head office personnel. Seaboard did not retain the services of many of the branch office managers for any substantial period of time. Thus, we cannot conclude that Seaboard intended to or did pay any amount for the acquisition of whatever goodwill might have resided in the personnel employed by the sellers. Likewise, the testimony with regard to office locations is significant. Seaboard did not pay anything for location nor would it add to or subtract from the price paid for loan contracts because of location. In almost all cases Seaboard leases the premises in which its branch offices are located. If the location of a branch office is unfavorable another location can be leased. Seaboard's concern in connection with purchases of loan contracts was that it not be saddled with a long or unfavorable lease. In no case did Seaboard acquire or use the seller's*164 name. Indeed, respondent has not seriously argued that Seaboard paid anything for the most common factor in establishing goodwill, i.e., the business name. All of the foregoing factors, taken together, demonstrate the greater strength of Seaboard's position. However, there are certain facts which show to our satisfaction that at least part of the excess payment or premium was paid for goodwill or going concern value. These facts are: (1) Loans were renewed from 2 to 3 times on the average; (2) some of Seaboard's new loan business comes from the refinancing of loans held by their present customers; (3) over 10 percent of Seaboard's new business comes from former customers who have previously paid up their loans; (4) customers acquired by Seaboard were sold or solicited for the purchase of life insurance and for the use of the "everready check" program; (5) some of the contracts between Seaboard and the sellers contain covenants not to compete, thus indicating the transfer of some goodwill; (6) start-up costs were avoided, thus enabling Seaboard to commence business at once by stepping into the shoes of the sellers and begin making a profit; (7) many of the loan companies acquired*165 were old established businesses; and (8) customer structure is an element of goodwill and has an intangible asset value of its own. Since we think that the excess consideration paid by the petitioners represented both premiums paid on the purchased loan contracts and intangible assets in the nature of goodwill or going concern value, the question arises as to the percentage applicable to each. Neither party offered evidence in support of specific allocations. Petitioners urge that the entire excess consideration was for premiums paid on purchased loan accounts, while respondent asserts that such excess consideration was attributable entirely to goodwill. However, by applying the principle announced in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), the record supports an appropriate allocation. After considering all of the facts established in the record relevant to such allocation, and applying our own judgment thereto, we have arrived at the allocations set forth in our ultimate findings. In support of his position respondent cites and placed great reliance upon United Finance & Thrift Corporation of Tulsa, 31 T.C. 278 (1958),*166 affd. 282 F. 2d 919 (C.A. 4, 1960). In our opinion his reliance is misplaced. There was no proof in the United Finance & Thrift case that anything more than the consideration stated in the purchase agreements was consideration for the loan contracts. In the present case we are confronted with a far different factual question. Here the purchased contracts stated the purchase price of the loan contracts, and the purchase price in each instance included the premium which was paid and, unlike United Finance & Thrift, Seaboard has produced evidence in support of its contention that the loan contracts were worth a premium and that it paid the premium as a part of the total consideration for those contracts. We regard North American Loan and Thrift Co., No. 2, 39 T.C. 318 (1962), affd. 319 F. 2d 132 (C.A. 4, 1963), as more analogous to the present case than United Finance & Thrift. In that case the taxpayer proved that the premium which was in controversy was part of the consideration for purchased loans and further proved a 14 month average life. On the basis of this proof we concluded that the premiums should have been amortized entirely in*167 taxable periods prior to those which were before the Court. Consequently, we denied a depreciation deduction for the taxable years there involved on the ground that the useful life of the asset had already expired in prior years. Having determined that Seaboard did pay a substantial part of the amounts as premiums for loan contracts, we now consider whether such contracts had limited useful lives. It is clear that the cost of a contract right is subject to amortization or depreciation. See Stewart Title Guaranty Co., 20 T.C. 630 (1953); Frances E. Latendresse, 26 T.C. 318 (1956), affd. 243 F. 2d 577 (C.A. 7, 1957), certiorari denied 355 U.S. 830; Indiana Broadcasting Corporation, 41 T.C. 793, on appeal (C.A. 7, August 10, 1964). The deductions claimed by Seaboard and disallowed by respondent were made pursuant to section 167, Internal Revenue Code of 1954, which allows a deduction for the exhaustion, wear*168 and tear of property used in a trade or business or for the production of income. Section 1.167(a)-3, Income Tax Regs., permits a depreciation deduction for amortization of the cost of intangible assets if the life of the intangible can be "estimated with reasonable accuracy." In these consolidated cases petitioners have presented convincing evidence of the estimated lives of the loan contracts purchased and we have concluded, as set forth in our ultimate findings, that the secured loan contracts had useful lives of 3 years and the unsecured loan contracts had useful lives of 5 years. As indicated on prior occasions, this Court is willing to accept something less than mathematical and absolute accuracy in estimating lives of depreciable assets. Indiana Broadcasting Corporation, supra.See also Northern Natural Gas v. O'Malley, 277 F. 2d 128 (C.A. 8, 1960); and cf. North American Loan and Thrift No. 2, supra. At the close of the trial respondent amended his answer to state an additional and secondary contention, which*169 is set forth in his brief. The contention is that - If the Court should determine that some part of the amount paid in excess of the face amount of the loan accounts and the value of the other assets was paid solely for the loan accounts, then the payment was for the loan accounts acquired from each small loan company in the aggregate. This payment was for a single indivisible asset, being all of the loan contracts acquired in each purchase. In reality, it was the customer structure of each of the small loan businesses acquired. This asset is continually being kept intact by the addition of new loans as the old loans are paid off. Accordingly, the excess cost or premium paid for this mass of loan contracts had a useful life that was indefinite and incapable of being estimated with reasonable certainty. As such, it was not subject to amortization or depreciation. Thrifticheck Service Corporation, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (2nd Cir. 1961); U.S. Industrial Alcohol Co., 42 B.T.A. 1323 (1940), affd. on this issue 137 F. 2d 511 (2nd Cir. 1943); Richard M. Boe, 35 T.C. 720 (1961), affd. 307 F. 2d 339 (9th Cir. 1962).*170 The indivisible asset rule has grown from a humble beginning in the last sentence of the opinion in The Danville Press, Inc., 1 B.T.A. 1171, 1172 (1925). The rule has since found favor with the courts and has provided the basis for the decisions in Thrifticheck, Boe, and U.S. Industrial Alcohol cases, which involved claimed depreciation of bank check servicing agreements, medical service arrangements, and customer orders, respectively. The opinion in each of these cases is carefully drawn to insure that the indivisible asset rule does not find application where it should not be applied. The first and most important limitation upon the rule is stated in Thrifticheck, wherein this Court specifically distinguished the situation there involved from that in which the taxpayer buys contracts with a determinable life calling for a fixed payment. Similarly, we pointed out in U.S. Industrial Alcohol, supra, that the "contracts" purchased were, as a practical matter, unfilled orders; they were not binding contracts which "contributed in any substantial degree to the value of the business." Both of these cases circumscribe *171 the rule and find it to be inapplicable to assets which are binding agreements to pay money or render other valuable services. In short, they limit the doctrine to a class of asset like customer lists and to contracts which in practical effect are like customer lists. We think Seaboard's purchased loan contracts do not fall within the class of asset to which the indivisible asset rule is limited. Seaboard's loan contracts called for a "determinable amount of income" over an "ascertainable period." Any refinancing or renewals were an integral part or extension of the existing loan contracts purchased and have been so considered in determining useful lives of 3 and 5 years. These loan contracts, including any which were refinanced or renewed, are the antithesis of unenforceable contracts. Cf. North American Loan & Thrift Co. No. 2, supra, at pages 321 and 326. Moreover, the indivisible asset rule does not apply to contracts and similar intangible assets which have identifiable and real value apart from goodwill. See North American Service Co., 33 T.C. 677 (1960).*172 In the Boe case, supra, a second exception to the indivisible asset rule is indicated. We suggest that if the taxpayer can show that his price was actually based upon the value of the contracts in question and that he made an effort to value them individually, then the rule will not bar a depreciation deduction. This exception also seems to fit Seaboard. In every purchase Seaboard placed a value on the specific loan contracts in each office and in almost all of the purchases this was done by individual inspection. In Boe we said: "Petitioner has shown us nothing to indicate that the contracts here in issue were not a collective, single asset." Here, however, Seaboard has presented evidence to the effect that small loan contracts are not fungible; that Seaboard typically placed a specific value on every purchased contract; that it did so in nearly every purchase here involved; and that two loan contracts which to a layman may look alike may in fact differ in value to the sophisticated buyer by a wide margin. Accordingly, we conclude that the indivisible asset rule does not apply to the loan*173 contracts here involved because the cases of Thrifticheck, Boe, and U.S. Industrial Alcohol are distinguishable. As to the secondary issue relating to payments made by Seaboard for costs connected with the issuance of a nontaxable stock dividend, we hold that such payments are capital in nature and therefore are not deductible expenses. See General Bancshares Corp., 39 T.C. 423 (1962), affd. 326 F. 2d 712 (C.A. 8, 1964); United Industrial Corp. v. Commissioner, 331 F. 2d 605 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court; and Arkansas Louisiana Gas Co. v. Commissioner, 331 F. 2d 850 (C.A. 5, 1964), affirming a Memorandum Opinion of this Court. To reflect the determinations made herein and to give effect to the issues settled or conceded by the parties. Decisions will be entered under Rule 50. Footnotes1. Proceedings of the following petitioners are consolidated herewith: Seaboard Finance Company, Transferee, Docket No. 1757-62; Seaboard Finance Company of Lynwood, Docket No. 1758-62; Seaboard Finance Company of Monterey, Docket No. 1759-62; Seaboard Finance Company of Northern California, Docket No. 1760-62; Seaboard Finance Company of Colorado Springs, Docket No. 1761-62; Seaboard Finance Company of Denver, Two, Docket No. 1762-62; Seaboard Finance Company of Denver, Three, Docket No. 1763-62; Seaboard Finance Company of Denver, Four, Docket No. 1764-62; Seaboard Finance Company of Denver, Five, Docket No. 1766-62; Seaboard Finance Company of Pueblo, Two, Docket No. 1767-62; Seaboard Finance Company of Connecticut, Inc., Docket No. 1768-62; Seaboard Finance Company (Idaho), Docket No. 1769-62; Seaboard Finance Company of Terre Haute, Inc., Docket No. 1770-62; Seaboard Finance Company Inc. (Mass.), Transferor, Docket No. 1771-72; Seaboard Finance Company of Flint, Docket No. 1772-62.↩